Alright, gentlemen, this is obviously a multi-volume episode in the BP saga of cases. So here we go. Mr. Wood. Good morning. Let me ask you . . . well, never mind. I'll wait to ask you that about the other case where the similar issue is pending. I'm happy to answer your question, Judge. Well, it's just a note that a similar issue was already argued and submitted to a panel. I know you're not prescient to know when that's going to rule, but I guess my question is, is it more probable than not that that panel will have to reach the question, as opposed to the similar issue may be among a whole bunch and they may decide the case on something else. So I'm not asking . . . but just is it poised? Sometimes we get these where there's a related issue raised, but it's just among a bunch of issues, and frequently a panel may go off another way. But just whether it's poised that . . . but there are other times when it's just impossible to avoid answering the question. I don't think it's impossible. I may not know the case. These cases have been sealed. I know I was able to attend oral argument. I've listened to it again on one of the cases involving an oyster company, which was similar, but I recall the facts still being a little different. And the facts in that case were more complicated from a factual standpoint, and here I think they're uncomplicated factually, but maybe from a legal standpoint, we have the water muddied a little bit. So if I may try to clarify what I mean by that. We have one issue that I believe is legal for this court to decide, and that is an interpretation of the settlement agreement, and whether or not the parties intended by this agreement to exclude businesses that had changes in its form over time. And what I mean by that, changes in form, is if a company changed form, it still continued as a going concern. And so the business as a going concern, following BP's interpretation, is excluded, and instead we have two different businesses, following BP's interpretation, that have two different possible claims. Following the interpretation of the appellant, Adams Produce, which was as a going concern since 1903, until after the relevant period of 2007 to 2011, which is relevant for a business economic loss claim, it was the same going concern, although it had different forms at the time. So the case is a change in form that happened in September of 2010, when it closed. Okay, but unpack that. I mean, we got that, and I'm sure the business was not my specialty at all. But, you know, saying ongoing, you know, could mean a lot of things. So if, for example, there's a sole proprietorship, and it's operating, and somebody says, well, you can't ammunize yourself from taxes, you ought to be a subchapter S. You know, it's still the mom and pop, they're still doing the same deal, but instead of taking a draw, they get a check, body, body, you know what I'm saying? But nobody disputes, it's the same mom and pop cooking the waffles and doing that deal. To me, and I know I'm oversimplifying, but I'm saying, in that deal, I'd see, okay, same mom and pop fixing the waffles, they just made a tax change from being sole proprietorship to a subchapter X, which was S, you know, for tax form purposes. And to me, it's clear to see that's the same ongoing entity, you got me? As opposed to a more complex deal, where here, if it's an asset purchase versus we're not taking the liabilities over here, you know, we strategically picked into this the assets, but the rest we left out. I'm just saying, it's clearer where it's the same, you follow what I'm saying? Whereas with this other deal, if this is this asset purchase, yet I left something over here, it's one thing to say it's been existing for 100 years, but maybe yes, maybe no. Do you follow me? But then I'm just saying, what's the clarity on this legal point of when is it the same and when is it not? Must it be a complete merger? You see what I mean? Versus the asset, and I looked, but I mean, I hadn't found the cases that sort of clarify for the rule of law, so. Well, I appreciate the simplification, because I believe it proves the point that we have to interpret the settlement agreement consistently, whether we have a simple change or a more most important, a more complex result. But let me unpack, if I may, your question, because within it are a lot of things that I think I'd like to address, because yes, in the case of Adams Produce, it's been described as an asset sale, but the document that we've been looking at is an asset transfer agreement, and what's most impressive to me about that agreement is that it's signed by the same person on both sides of the transaction, and you don't have to have been a transactional attorney to understand that if you represent both sides of the deal, you must have the same client, and I think that's important. Is this a C reorganization? No, Your Honor. This was an S-corp that became an LLC, and so both are passed through from a tax matter standpoint, and as I understand it, the reason for the change from an S-corp to an LLC is that an S-corp, you may only have one classification of membership, and in the complex result, not in the complexity of the transaction, but the complex result is that there are multiple classifications of membership, and that's what the beneficial owners wanted, and to do that, they had to change their form of the going concern to an LLC form, which does permit multiple classifications of ownership. Now, what you just said in terms of that explanation, I must have missed it because I was looking for, okay, what was the reason for this, and maybe I've just read too many BP briefs in this case, and they're all tangled up in my head in terms of what's there, but I could never . . . well, I guess in the short, one of you can identify to me where in the briefing or record what you just said is true. I'm not suggesting it's not true, but I kept looking for, well, what was the purpose of it to help illuminate, you know, is it the same? Well, to be fair, I can't tell you that I can say within the record where that explanation is, but I know that that is a reason to convert from an S-corp to an LLC, and I know that from the prior ownership and their schedules of who the owners were and who the owners are now, and there are two pages in the record with a bunch of lines drawing to the different corporate entities that are actually the owners and the beneficial owners of those entities are the people involved, but we know that there's Class A, Class B, Class C, Class D, and Class E membership in the resulting LLC, and we know that an S-corp does not permit that. So I think it's obvious on its face as what the purpose of it is, but there's no statement that I'm aware of in the record that says that. Okay, but that doesn't, I mean, I hear what you're saying, but to me, I'm not sure that helps you. I mean, what you're saying is, from what I understand, the assets got transferred. Not all the liabilities got transferred. Am I right? You're correct that substantially all the assets, there were three vehicles left out, a BMW X5, a Lincolntown car, and a Ford F350, which I think are obviously some of the beneficial owners' personal vehicles, okay? But when you have lists and lists over pages and pages of freight liners and internationals and other commercial delivery equipment for produce that all transferred 100 percent and all 100 percent of employees were officially terminated but in the same document said will be hired under substantially the same terms of their prior agreement. So you have all the employees going from one side, one form to the other. Substantially all the assets. And substantially. And not all the liabilities. But substantially all the liabilities. What was excluded was certain liabilities associated with prior deliveries. But what does go along and what's most important is that orders given and accepted and planned to be filled before this transaction were accepted and all the responsibility to then deliver the goods the next day was transferred. And so the business Why, you know, did all this whole deal, as you say, in Louisiana, get confected before the settlement agreement was signed or entered or the order on it? Yes, Your Honor. All this was done sometime in 2010. Okay. And the settlement Was not until 2012. I was going to say, I mean, talk about leading with your chin. How big is the claim here? So far as value? Yeah, no, I mean, what is it that the claimant asked for? The claimant has asked for business economic loss damages under the formula set out. The exact amount, I think, is subject to several gray areas of interpretation of the settlement as far as how to make the calculations. And I don't believe that the CSSP has actually published a calculation. So the accountants, I think, may have different I mean, is it so big a claim that they're making here that they should have gone through this whole transaction and thereby run the risk of leaving it behind? I mean, that's what I don't understand. Why would you do this if the claim was big enough to matter? I think the answer to that question is embedded in the law that the successor form still retains, under law, this claim. If Adams Produce still had this claim in the successor form as an LLC, it could go into court and sue on behalf of itself for all damages caused to it, including in its predecessor form as the successor in interest, because that claim carried over, too. Well, I understand that the claim carried over unless somebody said it didn't. The question is what apparently they're trying to do here is to be able to compare the finances before and after, so to speak. And so that's why there's a particular premium placed on comparing the same entities. Well, as I understand, what premium was paid so far as one of the advantages of the settlement agreement to claim versus the GCCF model was the ability to look back to not just 2009 and 2008, but to look back as far as 2007. If this transaction had happened in 2008 and we had a question of whether or not we could look back to 2007, it's a different question than we have here today, but I think it would be answered today in the affirmative that, yes, that is the operating history of this same going concern, because what's most important is that the business, the operations of the business continued seamlessly through this entire transaction, through July when the papers were filed in Delaware, through September 3rd when all the papers were ultimately signed, because so far as the employees knew, so far as the customers knew, so far as the vendors knew, everything stayed the same. Everything just moved over. And that's why even the title to the document, Asset Contribution Agreement, signed by the same person as CFO for both forms, is so telling as to what really happened here. And legally, in the successor form, that would be the real party in interest withstanding to make this claim. And there's nothing within the four corners of the settlement agreement that makes a delineation between businesses or entities, and I want to talk about the difference because I don't believe there is one, businesses that made these types of changes. I want to talk about two things on that. First, since it's not within there to have expressly done that, yet we have thousands of pages, maybe 1,200, maybe 2,000 pages of the agreement and all the exhibits. How they can be so specific about everything else, but not this, does not allow BP to come in and say, well, but if we construe the definition of entity to mean something other than it really says, then we can just draw artificial lines based on the registration and the probate quarter with the Secretary of State. And so since that's not within the four corners, I'm trying to unpack the agreement, and what I see is a definition of entity within the agreement, which is defined as an organization or an entity. So if an entity is defined as an entity, that's not helpful. You have what you claim you have, and I accept, is the business and the employees truck on through, so to speak. But what you definitely did is change the ownership structure. The ownership structure did change, and there's nothing within the settlement agreement that discusses that if ownership structure changes or ownership changes in any way, that that somehow impacts the ability of a business as a going concern to make a claim. And that's important. BP has in another case, it's been called TA operating, where a business that sold a certain percentage of BP branded fuel wanted to be able to say, well, for my non-BP branded fuel, I want to be able to make a claim. But it was specifically excluded with no percentage of how much BP branded fuel you sell determines whether you're in or out. However, under the defense contractor exception, if your business is more than 50% defense contracting, you're out. If it's less than 50% defense contracting, you're in somehow, some way. But here, there's no 25% change of ownership or 75% change of ownership or 50% change of ownership. There's nothing within the four corners of the document. So you argue that given the weightiness and detailed nature of the settlement agreement, unless there's an express, specific, explicit, down-to-the-bone prohibition of what transpired here, the clients are in. That's one of our arguments, among others. I see that I'm out of time. I'm happy to answer other questions on other arguments that I've made. All right. Well, you've saved some time on rebuttal. So let's hear from Mr. Clark, and then we'll be back to you. Thank you. I mean, what about that argument, Mr. Clark? I mean, Jiminy Cricket, this is not one of those where, you know, we can construe the document against the draft. If there was ever such a thing as all hands on deck drafting an agreement, this is it. I mean, I wonder how many cooks were in the kitchen drafting the settlement agreement, et cetera, et cetera. So we can't construe against drafters. That old notion is out of the books. But it is a fact the settlement agreement is explicit, if you will, in a lot of other things, although we've had our share from exit ramps and surface to all these other nooks and crannies that keep coming up in the settlement agreement that we, when at the table, got to say what it means when y'all were at the table. And we've, you know, been left to kind of construe this language body-by-body. So here we go, here, you know, putting aside the nicety of the business form, but there is no express prohibition, exclusion, et cetera, et cetera. So why should it be the tortuous examination of when is it and when isn't it when the parties could have put in something that expressly kept it out, or is that too simple? So, Your Honor, I think that this is covered by the express terms of the settlement agreement. And that's, I think, because Mr. Woods sometimes selectively quotes the provisions. He says that they're a class member as long as they are within the class geography in Section 1 and then as long as they have a facility within, you know, a certain time period. But that's what Section 1's introduction says. It also says, however, that in order to be a member of the class, you also have to fit within one of the damage categories in Section 1.3. That's specifically what the class definition provides. And that's the precise basis on which the CSSP and Judge Barbier denied this claim, as Judge King was getting at, which is that this does not fit into the BEL framework because you have to be able to compare an entity's pre-spill financials to its post-spill financials. And you can't do that if you have a new entity. To that, Mr. ---- Wait a minute. That's the question I wanted to ask. Sure. Let's assume that you have an unincorporated business, but, you know, a produce business, a business. And so the owners say, but it's unincorporated. And the owners say, maybe a husband and wife, and it's got to be a big business. And they say, you know, we really ought to incorporate. We're just sitting ducks here. So all they do is incorporate that business. So they now own all the stock, the pair of them, whereas before they just owned all the business, the assets and liabilities and whatever. Yes. In that situation, which is very simple, would you say that they can't, that their claim goes up in smoke? No, Your Honor. We would construe that as equivalent to, you know, a stock sale in this kind of a situation, right, that all that's changed is a matter of the legal form and not anything else. But this is not just a trend. Okay. Let's go through this, then. Why is this not simply a change in form? Sure. So, Judge, first of all, we think that Judge Barbier, as a matter of fact, found that and that there's been no showing that that's clear error. He gets, you know, hundreds or even thousands of these requests for discretionary review. He plucked this one out to reverse a CSSP appeals panel, which ruled for the claimant, to say that he saw this as an asset sale and not as a stock sale. And we think he's entirely correct about that. And this is a situation, as you were exploring, I think, Judge King, in your questions, that some assets were left behind. It doesn't really matter whether it's, you know, all or substantially. I mean, substantially all or, you know, a large chunk was left behind. Some of them were left behind to a different entity. And then all, you know, virtually all the liabilities were left behind to a different entity. And certainly if the new entity, which I'll call Adams LLC, if they were sued and tort, they'd be here, you know, screaming, well, we're a new entity. We left the liabilities of the old company behind for conduct that they engaged in. You know, we get a fresh start. Similarly here, they are a separate entity. Under the agreement, if they're a separate entity, an entity is a defined term in Section 38.65, and then it's an incorporated term in 38.15, which defines what a business claimant is. And in order to file a BEL claim and get compensated, you have to be a business claimant. So those definitions all lock up together with Exhibit 4, 4A, 4B, 4C, which provide the whole compensation mechanism. If they don't fit in as the actual entity that's making a claim for lost profits based on what they were doing before this bill and what they were doing after this bill, then they can't file a claim and they're not a class member under Section 1.3. And that's exactly what Judge Barbier held and what the CSSP original decision, the claims administrator, Mr. Juno, and his personnel had held. So we may see it as an entirely different situation than a mere change in corporate form. At every turn, Mr. Wood tries to pitch it as, you know, we just changed form. You know, this is a matter of labels. This is a matter of, you know, form over substance. That's all rhetoric. I mean, the actual finding in this case by Judge Barbier, in a relatively rare situation in which he granted discretionary review to BP to reverse an erroneous decision, was that this was an asset sale, not a stock sale. We wouldn't be here if it was a stock sale. We're here because the two entities are very different. I don't think Mr. Wood argued in his briefing before that the same person signed the agreement. It seems strange to emphasize that as a pivotal point. I'll give you what I think is a much better anecdote, which actually does appear in our briefing as to why they're separate entities, which is that Adams LLC, the newer entity, sued the accountants of Adams, Inc., the older entity, because they were supposed to have propped up what the valuation was and that, you know, if they'd known that, they might not have engaged in the agreement. That's entirely incompatible with the notion that you have one continuous going concern entity that's merely sort of, you know, taking one hat off and putting a different hat on. They're two different entities. They have different personnel involved. That's precisely what Judge Barbier found as a matter of fact, and we really don't see that there's any, you know, ability here by the claimants or even argument that there was, you know, they can get over the clear error standard as to what he found the nature of the transaction was, based on reviewing the asset agreement, the tax returns, the nature of the transaction, and then all the other materials that were in the record file at the CSSP. So in the things that matter to you, your client, you can't be income statements are not comparable. Right. And so that's exactly why we say, Your Honor, that they can't hybridize the financials. You know, it's almost like a kind of Frankenstein of, you know, pick the old ones from Adams, Inc., and then use that as the baseline, and then, you know, the new performance after this bill, which is supposed to show the loss, let's look at the financials of Adams LLC, the new entity. You can't do that under the agreement. That's what, you know, was found in, you know, by the CSSP and by Judge Barbier. It goes back to what really is the foundational law for this in terms of what this court held in what's often called Deepwater Horizon 1 about the matching of revenues and expenses. You can't match revenues and expenses if you're mismatching and, you know, kind of using apples and oranges from expenses and revenues, you know, from different entities together. It doesn't work that way. Mr. Wood's response to that in the reply brief was, well, we assigned the right to use the same financials to the new entity. The problem that that runs into, which is another reason why, you know, I think this appeal should fail, is that there's a bar on assigning claims inside the settlement agreement. In Exhibit 21, it's in Exhibit 21, 1.1.2.1, that section. Now, you'd ask the chronological question, Judge King, about, well, you know, they engaged in this transaction before the settlement, right? But the settlement was published before they would have had to decide whether to file a claim or not or opt out. So if rational lawyers looked at this agreement and saw a ban on assigning claims, I think rational lawyers would have advised Adams LLC to opt out. This is high risk. This is high risk. How much is the claim? We don't know either, Your Honor, and it's actually somewhat expensive to pay the accountants to kind of do the calculations. So since the CSSP hasn't done the initial calculation, it's not an issue that's in the record yet. But, you know, I don't think that it's a gigantic claim like some of the cases that are before you or will be before you, but I also don't think it's a small claim either. I think it's at least a kind of mid-sized claim, and they have three facilities that they're trying to make it for. And so, you know, prudent lawyers for sure would have looked at the bar on assignment and said, you know, at the very least, if we're going to file a claim and try to get inside the settlement, we should also preserve our litigation options and file a lawsuit so that, you know, if it turns out we're not in the settlement, you know, we're not time barred. And they didn't take either the step of opting out or the step of filing a lawsuit. I wanted to, you know, kind of go through, if I could, in addition to some of my affirmative points that I've hit, the answers to some of the questions that you started with. So, Judge, Chief Judge Stewart, you started with the question about what about this other case, which I took you to be referring to the Oystering case that Mr. Wood referred to. So I think it's possible that that case will decide this issue about an asset sale versus a stock sale. Indeed, that oral argument, Judge Graves was on that panel, and he specifically asked the question. You could listen to it. You know, but wasn't this transaction between the old Oystering company and the new Oystering company done as an asset sale and not as a stock sale? And then I think it seemed as if there was a comment to the effect of, you know, if you do that, you've got to take the bitter with the sweet. So it's possible that issue could be the one that the case goes off on, in which case it would become, I would think, precedent for this panel. There are two other issues there, which you were asking about, and the panel could also go off on those. One is our argument that there was no jurisdiction over that appeal because the appeal was filed at the 60-day mark based on an extension of the time to file for an appeal. And, you know, Judge Barbier granted them permission to do that, but we argue that that was an abuse of discretion, so it's possible the panel could just, you know, eliminate that case based on a jurisdictional ground. The other argument we thought was very promising, in addition to the asset sale argument on the merits in the Oystering case, was the argument that there's a baseball arbitration process set up in the agreement. So when the CSSP appeal panel gets a case, there's a proposal from BP and there's a proposal from the claimant, and the appeal panel has to decide between the two. It can't, you know, sort of pick a third number, right? And so in that instance, the number that the Oystering, you know, the new Oystering company, the claimant, the appellant in that case picked, was entirely unmoored from the settlement agreement. And, indeed, by their reply brief, you know, they had admitted that they had no basis for the number that was given to the appeal panel, and so we argue that if that's true, then that appeal should fail under the baseball process as well. So there are other arguments there, but I think those would be the three ones. And so then I have to leave, you know, obviously this panel to decide, you know, how to sequence things compared to that case. Let me ask you a question. Sure. If you contribute the assets to a new company in exchange for stock, that would be okay. I mean, those are sometimes called asset sales, but if it's to a new entity, and so would that be okay? I think it would depend on the facts, Your Honor. I mean, you know, are the liabilities in your hypothetical being left behind? Because if there's one entity that's left holding the bag for the liabilities, I think that, you know, ipso facto creates two separate entities. That's the whole point of it is to create two separate entities. You know, but if there's a situation in which, you know, there's some kind of, you know, there are IRS rules about deemed asset sales and the like. If there's something like that and it's, you know, you could characterize it as purely a change in form, then I think we'd be talking about a very different case. But this case isn't about a pure change in form. This case is about a change in substance so liabilities could be left behind, so some assets could be left behind. And indeed, you know, as I was saying, you know, if they're putting aside this issue of, like, who signed the agreements on which side because there was some continuity of personnel between the two things. If you have the newer entity suing the older entity's, you know, advisors, technical, you know, and professional advisors, I think it's very clear you have two separate entities. And if you have two separate entities, the claim can't get off the ground under 38.15, 38.65, as it feeds into Exhibit 4. Chief Judge Stewart, you'd asked the question about whether there was the same mom and pop or not, and so I think that's what I've been exploring with Judge King, is that this isn't a situation in which we're talking about, you know, a mom and pop that decides to go from one kind of, you know, tax treatment kind of a thing where everything flows through to them to another one, or whether they decide to formally incorporate because they see some advantage to that or not. But everything otherwise is unchanged, you know, the operation, the personnel, the ownership. This just isn't that case because there are changes in those things. There were two entities, and there were liabilities left behind, and that's why Judge Barbier focused on that in reversing the CSSP appeal panel. And then the other two CSSP appeal panels that came along for their two other claims said, Judge Barbier's ruled, and if you look back at the CSSP appeal panelists, he's pretty on the fence. He sort of says, my decision isn't without doubt. And, you know, Judge Barbier then later resolved the doubt, and the other appeals panels then said, you know, that's what we're bound by, and that's what's correct. Mr. Wood was talking about, you know, some kind of purpose for this to create different classes of owners or, you know, holders of interest in this company in the LLC form. You know, I don't think there's anything in the record about that, as I think he candidly admitted, but even if there were, Judge King, I agree with you that I don't see why that would be helpful because that would be more of a reason that a separate entity is being established. That's more change. More change. More change. Exactly. On the other hand, if the liabilities hadn't been left behind, if all the assets and the liabilities had transferred, and we now have a more complicated corporate structure, but the assets and liabilities all migrated, then that's a harder case. That's a harder case. On that, I can see that's a harder case, but that's not this case, and it's also relying on sort of purposes that, you know, are being advanced for the first time in oral argument, and not ones that have been advanced before the CSSP so they could be explored in a record, you know, could be built about them. All right. Mr. Wood referred to the TA operating case, which is another case that was before this court. That court is another apples and oranges situation because in that case, what was at issue was not the issue of class membership under Section 1, but the issue of an exclusion under Section 2, and there's an exclusion under Section 2 for selling BP-branded fuel, and the TA operating sold BP-branded fuel. They tried to argue, well, you know, an exception should be created if we're selling a de minimis amount of BP-branded fuel, and the panel of this court said, no, there's not an exception there. Mr. Wood says, well, there's an exclusion for defense contractors, too, and that one has a 50% threshold. Well, precisely. There's a 50% threshold in the text of the agreement, and under the Expresso Unis canon, you can't take a numerical threshold from one exclusion and carry it over to another exclusion. That one didn't have a numerical threshold, so it was intended not to have that. So then let me try to make quickly what are my seven affirmative points, some of which I've already made, but I think I can do it in the time remaining. The first point, which I've obviously emphasized a lot, is that Judge Barbier found, as a matter of fact, that this was an asset sale after reviewing the record, and we don't see any basis for saying that's clear error. Mr. Wood's going to say, well, contract construction is a legal question. Well, you know, but they don't really point to any particular part of the contract that's contrary to the finding that this was an asset sale. They just try to apply a new label to it. He says at one point it's a recharacterization. He was arguing as well that in the definitions that there was a difference between entity and organization or something. I know you argued it the same, but I thought he was also. Mr. Wood repeatedly argued in the briefs that there's nothing in the settlement agreement for BEL claims hinges on what the definition of an entity is, and we think that's just flatly false. I think here's the best way to follow the sequence. If you look at how you get compensated under Exhibit 4, 4C, the very first sentence in 4C says a business claimant gets compensated, you know, et cetera, under this provision. So business claimant is a defined term. A business claimant is defined as a capitalized entity, which is also a defined term. The business claimant is in 38.15 defined. The entity is defined in 38.65. And so it's integral to the agreement that you look at whether they're separate entities or not for purposes of determining whether they can be class members under Section 1, in particular because you can't be a class member under Section 1 under subsection 1.3 unless you can get through the BEL framework, unless you have a valid claim under the BEL framework. And as the CSSP found, you can't do that. The second point actually was that when Mr. Wood quotes Section 1 about class membership, he focuses just on Section 1 and 1.1 about selling goods and having a facility during a particular time period. He ignores Section 1.3, and he ignores the definitions that feed into Section 1.3. The third point were these definitions I ran through, 38.15 to 38.65. And then point four was what Exhibit 4C says about the fact that you have to be a business claimant. Okay, so let me get to point five. I've also mentioned it. It's the fact that whatever is true here, you can't pursue an assignment because the assignment of claims was barred under Exhibit 21 in Section 1.1.2.1. There was one specific kind of assignment that went to claims against Transocean in Halliburton, but it didn't go to any individual class members. It went only to class counsel, to the class as a juridical overall entity. They're pursuing their claims against Transocean in Halliburton in entirely separate litigation, which has also engendered separate class settlements. Point number six was that to the extent there's any ability to piggyback on proxy— I'm sorry, on financials of another entity, it's only for proxy causation claims, which is a special exception. And we explained that in the brief. The second point is that they try to rely on Section— I'm sorry, the seventh point is that they try to rely on Section 2.2.4 about juridical entities being something you should set to the side and corporate formalities and the like. That's only a provision that tells you that when you're looking at the exclusions, you should not look at changes and differences in juridical form. That provision, there's no counterpart to it in Section 1 about class membership. They're trying to take a provision about how to construe the exclusions and move it over to construe the class definition, and that's not proper. I see my time has ended. I have one last point, if I could finish it. Go ahead. I'm going to let you make it. Okay. And the last thing that they try to do is they try to say that they should win this case because once you are a class member and you do get paid and you sign an individual release, you're bound and your certain successors and predecessors are bound. And they try to argue that because of that, you should construe this to allow the new entity to stand in for the old entity. The problem with that argument is that there's nothing that guarantees that there's parity between the claims that are released and the claims that fit within the program. You have to decide whether the claims fit within the program by looking at those definitions. Once you've decided to sign on the bottom line, you've accepted a deal, and under that deal you get something like multipliers, the so-called RTPs, the risk transfer premiums in the agreement, but you also agree to waive a broad class of claims, broader potentially even, especially for a number of claimants, that are ones that you haven't gotten paid for. That's just the deal you made. You can't then use that release to kind of backwards infer that they should be able to file a valid claim. That logic doesn't work. And with that, thank you very much. All right. Thank you, Mr. Clark. All right. Back to you. Go ahead. I'm not running away from or trying to avoid Section 1.3 or any other part of the agreement. What I'm trying to do is try to understand their argument so that I can then explain our argument. And since I don't see it within the four corners of the agreement, I'm trying to figure it out, and I think where they are missing it is when they throw around the term entity and say it's a defined term. Look, it's defined right there in Section 38.65. But the definition is not really much of a definition. It defines entity as an entity. And there's so much mix-up, or the word entity is so replaced by the word business throughout the agreement, it's also used synonymously with business in the court filings. In Judge Barbier's original opinion, which is 910 Fed Sub Second 891 on page 903, giving the overview of this entire settlement, he says, the putative class consists of private individuals and businesses defined by, one, geographic bounds, and, two, the nature of their loss or damage. The nature of Adam's Produce loss and damage is in 1.3, and it's 1.3.1.2, the economic damage category. Adam's Produce is claiming economic loss because of the oil spill. So we're not running away from that, but this is the second sentence. Right after what Judge Barbier just said about businesses, it says, both criteria must be met in order for the person or entity to be within the settlement class. So the business is the entity. When you read the settlement agreement like that, that the business is the entity. The business claimant is the entity. Adam's Produce is the business. Adam's Produce is the going concern. And successors do have rights to use the business records that they have for the going concern to make their claims at law, and they knew that in 2010. At the time all this was done, in September of 2010, the oil was still being cleaned up on the beach. The MDL had not even been created, much less the lawyers who would then negotiate and structure this complex and unique contract, the settlement agreement, which is to be construed by this court as to what it means. Does it or does it not exclude the going concern, the business as a going concern as a claimant? And I think the only answer, which is actually helpful to the CSSP and helpful to Judge Barbier to give him the guidance, is yes, you look at the going concern. You don't look at the form changes, whether it's an asset sale or an equity sale. If it's the same going concern, the same business operations, which is what a business is, it's the operations to make a profit. Well, what do you say about, I mean, the argument they're making here and elsewhere is that what's critical is being able to look at the financials pre-spill and post-spill and being able to say this is the same entity. Now, he says, fine, if it was a sole proprietorship and it was incorporated, but all the assets and all the liabilities went over, no problem. But that's not what happened here. The financials are in the record, so the court can see it for themselves. The same CFO, the same controller, the same accountants, the same ---- But that's not going to ---- The question is the substance of the assets and liabilities. Did they all get transferred? The liabilities get assumed, all of them. Did the assets get transferred so that it's really the same business? Well, first of all, for the calculations to be done under the settlement agreement, all they look at is revenue and expense. They don't look at inchoate liabilities and what may or may not be out there. On the revenue side and the expense side, the financial statements that were provided for 2007 to 2011, just like every other business economic loss claim, have the same line item descriptions throughout, so they can easily use the financials provided to make the calculations on the settlement agreement. There's no question about that. You all left liabilities behind or sent them somewhere else? Well, the balance sheet is not what is used for making the calculations. To answer the question, I mean, is that in this record what happened to the liabilities? Some liabilities were not transferred. Substantially all liabilities were. What was excluded were the liabilities that were associated with prior sales, if any. The record doesn't really show there are any. It clearly was not 100 percent because you keep saying ---- It was not. You keep saying substantially. Right, it was not. Substantially. Just like substantially all the assets, but there were three vehicles left out. A Lincoln Town car, a BMW X5, and an F350 is not a substantial change in the operations of the business. It sounds like more than just those vehicles were part of the not substantial. Are you telling me everything except the three vehicles? That's right. There's a schedule for excluded assets. Excluded assets under the asset contribution says all the assets except on this list look in 2.1M. And there's a schedule. It's that three cars by VIN number. And that's it. Everything else was transferred. And you don't need to look at liabilities. You just need to look at revenue and expense to make the calculation. And they certainly can do that. Liabilities generally have some relation to expense, in my experience. Well, if there was a past liability that, for example, if there had been a slip and fall in the past and that slip and fall was paid in the past, then there may be a payment under a light amount of expense in the past. But that's not still in the books to be taken forward. It's done. So it's not to be taken forward, whether it's an equity sale or an asset sale. It's all in the past. The risk and the payment is done and in the books. And the books are all there to look at. And that's, if I've answered all your questions, my time is up. And we appreciate the spirit and vigor of all these BP cases. I don't know what we'd do if we didn't have a steady diet of steady diet. But we learn a lot about not only the spill but about the settlement agreement. But, you know, we take the points that you offered in brief. Both of you briefed it. And we'll take a real hard look not only at the filings but the settlement agreement, et cetera, and we'll ferret it out. We'll see whether the issue in the other case becomes dispositive by them or us. But that's an internal, as you know, matter to deal with. Your Honor, if I may mention one thing, 4.7 of the agreement goes to answer the question about the anti-signability in addition to the release, which has been briefed. Thank you. All right. This concludes the arguments for today.